**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JAMES HANCOCK, MD,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No. <u>4:25-cv-00543</u> |
| | § | |
| **QSC ADMIN LLC ,** | § | |
| | § | |
| **Defendant.** | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW, Plaintiff James Hancock, MD ("**Dr. Hancock**" or "**Plaintiff**"), by and through his undersigned counsel, and hereby files this Original Complaint against QSC Admin LLC ("**QSC**" or "**Defendant**"), and would respectfully show the Court as follows:

### I.
### INTRODUCTION

1.     This is a breach of an executive contract case. QSC hired Dr. Hancock as its Chief Medical Officer to assist in launching and operating a start-up specialty infusion platform marketing a cost-plus pricing model for self-insured employers employing individuals needing high-cost specialty infusions for rare medical conditions under their health plan.

2.     After retiring from a forty-year Naval career at the rank of Rear Admiral, Dr. Hancock was approached and recruited by QSC to join its organization. QSC marketed itself to Dr. Hancock as having the admirable mission with the primary goal of assisting small employers with self-funded health insurance plans find a more affordable source of specialty infusions for employees requiring medications for rare diseases that are often extremely expensive. Dr. Hancock's unique skills and background, having served as the Corps Chief of Naval Medicine worldwide, overseeing more than four thousand three hundred (4,300) physicians, nineteen (19)

medical centers, two (2) hospital ships, and over thirty (30) Navy medical commands and ambulatory care clinics, made Dr. Hancock an ideal recruit for to be QSC's Chief Medical Officer.

3.      In order to recruit Dr. Hancock to join QSC and reject other lucrative business opportunities available to him, QSC offered Dr. Hancock an Executive Employment Agreement ("Agreement").   The Agreement provided Dr. Hancock with a base salary of $700,000.00. Additionally, Dr. Hancock was entitled to one percent equity in Quantify Specialty Care that vested after ninety (90) days of employment with QSC, and another one percent that vested over time. On top of this, Dr. Hancock was promised a substantial severance payment if QSC terminated the Agreement without cause.

4.      Unfortunately, less than a year into his employment, QSC decided that Dr. Hancock's credentials were far greater than what it could utilize as a start-up and apparently, what it could actually afford. Rather than being honest and transparent with Dr. Hancock, terminating the business relationship without cause and honoring the contractual severance and equity provisions of the contract, QSC initially tried to convince Dr. Hancock to resign and accept half of what he was owed.

5.      When Dr. Hancock rejected QSC's offer and expected it to honor the terms of their agreement, QSC manufactured reasons to justify a termination with Cause and deprive Dr. Hancock of all of his severance.

6.      Because QSC terminated the contract without Cause and did not provide thirty (30) days advance notice of a termination without Cause, Defendant owes Dr. Hancock severance in the amount of $700,000.00. Additionally, QSC owes Dr. Hancock $58,333.33 as salary for March 2025 and an amount equal to one percent equity in Quantified Specialty Care, plus attorney's fees,

pre- and post-judgment interest, and/or specific performance in the form of an order compelling the issuance of Dr. Hancock's contractually promised equity.

## II.
## PARTIES

7.      Dr. Hancock is an individual and a citizen of the United States and the State of Texas, and is domiciled and resides in Colleyville, Texas.

8.      Defendant QSC Admin, LLC is a privately held, foreign limited liability company formed under the laws of the state of Delaware and engaging in systematic and continuous business in the state of Texas.  QSC has its principal place of business in the State of Ohio. Despite doing business in the State of Texas, QSC failed to appoint and does not maintain a registered agent for service of process in the State of Texas. Thus, QSC can be served through the Texas Secretary of State at 1019 Brazos Street, 1st Floor Lobby, Austin, Texas 78701. Tex. Bus. Org. Code § 5.251.

9.      The Texas Secretary of State can forward summons and the complaint to QSC's registered agent for service of process in Delaware: Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

## III.
## JURISDICTION AND VENUE

10.     Subject matter jurisdiction is proper under 28 U.S.C. § 1332 because Dr. Hancock and QSC are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11.     No member of QSC is a citizen of the state of Texas.

12.     This Court has personal jurisdiction over QSC because Defendant has sufficient minimum contacts with the State of Texas as a result of regularly and systematically conducting business in State of Texas, employing Dr. Hancock, as well as other employees, including its

President and Chief Operating Officer, in the State of Texas, entering into, performing and breaching contracts in State of Texas, serving patients and customers in the State of Texas and generally subjecting itself to general personal jurisdiction in State of Texas. According to QSC's public marketing materials, it has substantial operations in Texas, including providing home infusion services to Texans and operating fifteen physical infusion clinic locations in the state.



https://online.fliphtml5.com/opoim/zjkn/#p=9 (last visited May 21, 2025)

13.     Personal jurisdiction also exists specifically over QSC because the events giving rise to the causes of action in this lawsuit occurred in this state and in this judicial district.

14.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to the claims occurred in this district.

## IV.
## CONDITIONS PRECEDENT

15.     All conditions precedent to the filing of this suit have been satisfied, performed, or have otherwise occurred, as required by law or the applicable contracts.

# V.
## <u>FACTUAL ALLEGATIONS</u>

**A.     Dr. Hancock's Employment with QSC.**

16.     On March 28, 2024, Dr. Hancock and QSC entered into an Executive Employment Agreement (the "Agreement") whereby Dr. Hancock, effective on or about September 1, 2024, would serve as the Chief Medical Officer of QSC. Prior to commencing his employment with QSC, Dr. Hancock and his wife settled in Colleyville, Texas, as QSC planned to eventually be headquartered in DFW. QSC's President and Chief Executive Officer also resided in the Northern District of Texas

**B.     Relevant Terms of the Agreement.**

> ***i.     <u>Terms Related to the Initial Employment Period and Renewal Period.</u>***

17.     Under the Agreement, Dr. Hancock was to be employed for an initial term of "one (1) year" . . . commencing on [September 1, 2024] and ending on September 1, 2025 (the "Initial Employment Period")." *See* Executive Employment Agreement, attached hereto as **Exhibit "A."** Thereafter, the Agreement would automatically renew for successive one (1) year periods thereafter (each a "Renewal Period" and together with the Initial Employment Period, the "Employment Period"), absent one of the parties exercising its right not to renew the term of the Agreement. *Id*.

> ***ii.     <u>Terms Related to Compensation and Benefits.</u>***

18.     Per the terms of the Agreement, Dr. Hancock was entitled to a base salary of $700,000.00, for the Initial Employment Period "payable in accordance with the normal payroll practices of the Company for its senior level executives as in effect from time to time (but no less frequently than monthly) . . ." *Id*.

19.    Furthermore, according to the terms of the Agreement, Dr. Hancock's base salary was subject to annual review and could be increased, but not decreased, by the Board. *Id.*

20.    In addition to his base salary and the Annual Bonus, Dr. Hancock was also entitled to equity compensation under the Agreement. Specifically, the Agreement stated that QSC's Board would grant Dr. Hancock "2% of the equity in Quantify Specialty Care." Per the Agreement, "[t]he first 1% of said equity was to vest upon the completion of 90 days of continuous employment with [QSC], with "[t]he remaining 1% shall vest[ing] in equal installments monthly over the subsequent two years, subject to [Dr. Hancock]'s continuous employment with the [QSC] during this period." *Id.*

21.    Further, the Agreement provided Dr. Hancock the ability to vest in an additional one percent equity in the event that he was terminated without cause, terminated by reason of disability, resigned for Good Reason, as each is defined by the Agreement, or if QSC opted not to renew his contract. *Id.*

    *iii.*    <u>*Terms Related to Termination and Notice Requirements.*</u>

22.    The Agreement contained specific stipulations, including a cash severance owed to Dr. Hancock, in the event that he was terminated without cause, resigned for Good Reason as defined by the Agreement, or QSC opted not to renew the agreement with Dr. Hancock.

23.    Specifically, Section 3.1 of the Agreement states, in relevant part, as follows:

> (c)    The Company may terminate Executive at any time without Cause (as defined in Section 3.7) prior to the expiration of the then-current Employment Period from the position in which Executive is employed hereunder **upon not less than thirty (30) days' prior written notice to Executive**, and the Company may terminate Executive upon the last day of the then-current Employment Period by providing the requisite notice not to renew in accordance with Section 1.1 above. The Company shall have the discretion to place Executive on "garden leave," and to not require or permit Executive to report to work or to provide any continued services, during the

notice period, and the last day of any such notice period shall be the effective date of termination of Executive's employment as an active employee. In addition, Executive may initiate a termination of employment by resigning under this Section 3.1 for Good Reason (as defined in, and in accordance with the notice provisions set forth in, Section 3.7) prior to the expiration of the then-current Employment Period.

(d)     Upon termination under this Section 3.1, Executive shall receive (i) Executive's accrued but unpaid Base Salary through the date of termination, (ii) any unreimbursed business expenses incurred by Executive and payable in accordance with the Company's standard expense reimbursement policies, (iii) benefits earned, accrued and due under any retirement plan, health and welfare benefit plan in which Executive was a participant in accordance with applicable law and the provisions of such plan, and (iv) any then-accrued-but-unused vacation (collectively, the "*Guaranteed Payments*"). With the exception of unreimbursed business expenses, which shall be paid in accordance with Company policy and Section 20 of this Agreement, Executive will be paid the Guaranteed Payments on the Company's first (1st) payroll date after Executive's date of termination, or earlier if required by applicable law.

(e)     If Executive's employment terminates as described in Section 3.1(a) above prior to or in connection with the expiration of the then-current Employment Period and if Executive executes within twenty-one (21) days (or forty-five (45) days to the extent required by applicable law) thereafter and does not revoke a written release of claims in a form mutually acceptable to Executive and the Company releasing the Company from any and all claims with respect to all matters arising out of or related to Executive's employment by the Company or the termination thereof (the "*Release*"), Executive shall receive cash severance (the "*Severance*") in an amount equal to: 1) half (1/2) the Executive's Base Salary if terminated prior to the six (6) month anniversary of this Agreement; or 2) the Executive's Base Salary if terminated on or following the six (6) month anniversary of this Agreement (in each case determined without regard to any reduction in Base Salary giving rise to Good Reason). The Severance, less all required withholdings and deductions, shall be paid during the six (6) month period (in the case of a termination if terminated prior to the six (6) month anniversary of this Agreement) or the one (1) year period (in the case of a termination if terminated on or following six (6) month anniversary of this Agreement) commencing on Executive's date of termination in substantially equal installments consistent with the Company's regularly scheduled payroll until the Severance has been

paid in full (the "*Severance Period*"), subject to Section 3.1(d) below.

24.    Further, the Agreement also includes the following provision related to QSC's ability to terminate Dr. Hancock for Cause:

> The Company may terminate Executive's employment at any time for Cause upon written notice to Executive, and Executive may terminate Executive's employment at any time without Good Reason or may elect not to renew the then-current Employment Period by providing the requisite notice not to renew in accordance with Section 1.1 above, and in any such event all payments under this Agreement shall cease. The Executive will not receive the Severance or any other severance compensation or benefits, except that the Company shall pay to the Executive the Guaranteed Payments.

25.    The Agreement defines the term "Cause" as follows:

(a)    "***Cause***" shall mean any of the following grounds for termination of Executive's employment:

    (i)    Executive's conviction or plea of "guilty" or "no contest" to any crime constituting a felony in the jurisdiction in which committed, any crime involving moral turpitude (whether or not a felony), or any other violation of criminal law involving dishonesty or willful misconduct that materially injures the Company (whether or not a felony);

    (ii)    Executive's willful misconduct in the performance of Executive's duties to the Company, where such willful misconduct has resulted in material harm to the business, property, or public reputation of the Company;

    (iii)    Executive's willful commission of any act of fraud or embezzlement with respect to the Company;

    (iv)    Executive's willful and material breach of any material provision of this Agreement.

        For purposes of this Agreement, the Company shall have Cause to terminate Executive's employment upon the Board's reasonable determination in good faith that a "Cause" condition under such clauses has occurred.

26.     Finally, the Agreement contained specific requirements for QSC to notify Dr. Hancock of any termination, as follows:

> Any termination of Executive's employment shall be communicated by a written notice of termination to the other party hereto given in accordance with Section 13. The notice of termination shall (a) indicate the specific termination provision in this Agreement relied upon, (b) briefly summarize the facts and circumstances deemed to provide a basis for a termination of employment and the applicable provision hereof; provided, that no basis need be provided by the Company in connection with a termination without Cause or a Company non-renewal of the Employment Period, and (c) specify the termination date in accordance with the requirements of this Agreement.

## C.    QSC's Breach of the Agreement.

27.     Per the terms of the Agreement, Dr. Hancock was entitled to a base salary of $700,000.00 for the Initial Employment Period. Further, the Agreement required that all payments by QSC to Dr. Hancock be "subject to applicable tax withholding," and QSC was required to "withhold from any payments under [the] Agreement all federal, state and local taxes as [it] was required to withhold pursuant to any law or governmental rule or regulation." *See* **Ex. A**.

28.     QSC first breached its contract with Dr. Hancock in December 2024 when it failed to pay him his monthly base salary and failed to issue his one (1) percent vested equity in Quantify Specialty Care.

29.     Dr. Hancock made multiple requests for payment of the December 2024 portion of his base salary.

30.     Unfortunately, Dr. Hancock's initial and subsequent written requests were ignored by QSC, and Dr. Hancock did not receive payment for December 2024 until March of 2025, and only then without QSC making the required tax withholdings and employer tax contributions to the Internal Revenue Service in connection with that payment.

31.     QSC again breached the Agreement in February 2025 when it failed to timely pay Dr. Hancock's monthly base salary. Once again, Mr. Hancock notified QSC in writing of its failure to make the agreed-upon payments in both December 2024 and February 2025.

32.     On March 18, 2025, QSC paid Dr. Hancock a gross amount of $58,333.33. However, in making this payment, QSC failed to deduct the applicable taxes and other withholdings and failed to make the employer tax contribution as required by law and the Agreement. By failing to withhold taxes and other withholdings required by law and the Agreement from the March 18, 2025, payment, QSC breached the Agreement, resulting in damage to Dr. Hancock.

33.     Furthermore, QSC never issued or caused to be issued, the equity in QSC after his completion of ninety (90) days of continuous employment with QSC as required by the Agreement.

34.     Consequently, Dr. Hancock is entitled to an amount equal to one percent of the equity of Quantify Specialty Care or specific performance in the form of an issuance of those unencumbered shares at Dr. Hancock's election.

35.     In late 2024, QSC learned that its anticipated business with the state of Florida that was expected to add one thousand patients to QSC's business in early January 2025 would either be delayed or canceled.

36.     After struggling to find the funds to pay Dr. Hancock's December salary, in late January or early February 2025, Sumanth Reddy ("Reddy"), QSC's Chairman contacted Dr. Hancock to communicate that QSC was not able to fully utilize his skills and began discussions for an amicable exit from the Company.

37.     Reddy is a resident of Southern California.

38.     In these January or February conversations, Reddy did not communicate any reasons for a separation of employment other than Dr. Hancock's high salary, the Clinical Team not utilizing Dr. Hancock to his full potential, and prospective customers only being interested in the cost savings QSC could offer and not briefings from the Clinical Team of which Dr. Hancock was a part as the Chief Medical Officer.

39.     Further, Reddy informed Dr. Hancock that QSC was unable to fully fund Dr. Hancock's severance, as it would need to hire three or four lower level medical directors to replace Dr. Hancock and QSC's budget would not permit it to pay the full $700,000.00 severance within the timeframe outlined in the Agreement.

40.     In February 2025, Reddy repeatedly attempted to persuade Dr. Hancock to accept less than he was owed under the severance and equity terms of the Agreement. Reddy further stated that no one other than Dr. Hancock at QSC made over $400,000.00.  Reddy also indicated that he was not going to be able to pay the $700,000.00 severance even over twelve (12) months, as he would need to replace Dr. Hancock with multiple, lower-level, lower-skilled medical directors.

41.     To this end, Reddy offered to pay the $700,000.00 severance over eighteen months but refused to offer a personal guarantee.

42.     At no time in any of Reddy's efforts to convince Dr. Hancock into taking less severance for a termination without Cause did Reddy say that QSC had Cause to terminate the Agreement or offer any specific information about how Dr. Hancock supposedly engaged in conduct that would give the QSC Cause to terminate Dr. Hancock's employment.  Indeed, Reddy's justifications for the desire to reduce the severance amount and/or extend the payment terms was tied directly to financial and budget issues with the Company.

43.    Prior to February 28, 2025, Dr. Hancock had never been written up, provided with a written counseling or disciplinary action, placed on a performance improvement plan, or provided any written documentation communicated that he was not fully and satisfactorily performing his duties as QSC's Chief Medical Officer.

44.    On February 28, 2025, Reddy abruptly sent Dr. Hancock an email advising him that QSC had determined to terminate Dr. Hancock's employment effectively immediately. The timing of the termination was both suspicious and purposeful as Dr. Hancock's severance increased from six (6) months to twelve (12) months if he was employed for more than six (6) months. March, 1, 2025 would be greater than six (6) months. And Reddy had to style it as a termination for Cause to end the relationship immediately as a termination without Cause required thirty (30) days advance written notice.

45.    The email stated for the first time, falsely, that Dr. Hancock's termination was appropriate under the Cause provisions of the Agreement based on his willful and material breach of a material provision of the Agreement.

46.    Accompanying the email was a proposed Severance Agreement that only offered to pay Dr. Hancock half of the severance he was owed for a termination without cause (the same half portion that Reddy had previously attempted to convince Dr. Hancock to accept in order for QSC to use the remaining funds to hire three or four replacement medical directors), offered to pay the half portion of the full severance amount over twelve (12) months instead of the six-month timeframe set forth by the Agreement, and failed to address both the vested equity Dr. Hancock was entitled to and unpaid salary owed to him for March 2025 which Dr. Hancock was entitled to for the thirty day notice period of a termination without Cause, all in exchange for a release of claims against QSC and its Chairman Reddy.

47.     Neither the email nor the proposed Severance Agreement summarized any of the facts or circumstances that provided a basis for a termination for Cause as defined by the Agreement.

48.     Dr. Hancock rightfully rejected QSC's attempt to pay less than what was owed for a termination without Cause.

49.     On March 31, 2025, QSC sent Dr. Hancock a Notice of Termination for Cause signed by Reddy as its Chairman. The Notice backdated the date of termination to February 28, 2025.

50.     In sum, Defendant has refused to pay Dr. Hancock his severance of $700,000.00, has failed to pay his base salary of $58,333.33 for March 2025, has not reported or paid the employer portion of taxes and withholdings due on Dr. Hancock's December 2024 wages, and has failed to issue Dr. Hancock his unencumbered vested equity in Quantify Specialty Care.

51.     These actions each constitute breach of the Agreement on the part of QSC.

52.     Dr. Hancock has suffered damages as a result of QSC's breaches of the Agreement.

53.     QSC's breach and failure to adhere to the terms of the Agreement was in bad faith and done intentionally and maliciously.

54.     As a result of QSC's breach, Dr. Hancock has suffered a loss of benefits and other compensation bargained for as part of the Agreement.

## VI.
## FIRST CAUSE OF ACTION-BREACH OF CONTRACT

55.     Dr. Hancock incorporates the allegations in the preceding paragraphs as if fully set forth herein.

56.     Dr. Hancock and QSC entered into a valid and enforceable contract in the form of the Agreement.

57.     Dr. Hancock fully performed under the Agreement.

58.     QSC breached the Agreement in the following respects:

59.     Failing to timely pay all compensation due and owing under the Agreement;

60.     Failing to withhold Dr. Hancock's portion of the employee taxes from his compensation and failing to properly report and pay QSC's portion of employee taxes and social security to the Internal Revenue Service and pay QSC's portion of the employment taxes it owed on Dr. Hancock's compensation;

61.     Failing to follow the notice and termination provisions for a termination without Cause;

62.     Failing to follow the notice and termination provisions for a termination with Cause;

63.     Failing to pay Dr. Hancock twelve (12) months of severance for a termination without Cause;

64.     Failing to issue one percent of equity in QSC after Dr. Hancock's completion of ninety (90) continuous days of employment with QSC as  required by the Agreement

65.     As a direct and proximate result of QSC's breach, Dr. Hancock suffered damages and is entitled to the agreed-upon monetary amount of $758,333.33, an amount equal to one percent equity in Quantify Specialty Care, and all other benefits provided for in the Agreement.

## VII.
## ATTORNEYS' FEES AND COSTS

66.     Dr. Hancock incorporates the allegations in the preceding paragraphs as if fully set forth herein.

67.     Because QSC has breached its contractual obligations to Dr. Hancock and required him to file this lawsuit, Dr. Hancock has retained the undersigned law firm and incurred attorneys'

fees and costs. Dr. Hancock seeks to recover his reasonable attorneys' fees and expenses incurred

through trial.

## <u>PRAYER</u>

For these reasons, Dr. Hancock asks for a judgment against QSC for:

    i.    Payment of all benefits, severance, bonus, reimbursement for taxes paid that Defendant should have paid, and other compensation set forth in the Agreement for a Termination without Cause;

    ii.    An amount equal to the fair market value of the equity of Quantify Specialty Care that was to be granted to Plaintiff under the Agreement or specific performance in the form of an order compelling the issuance of that equity to Plaintiff at his election.

    iii.    All other recoverable damages suffered by Plaintiff, including but not limited to, punitive, compensatory, and consequential damages sustained by Plaintiff as a result of Defendant's actions;

    iv.    Reasonable attorneys' fees, costs, and all other expenses incurred by Plaintiff in enforcing his contractual rights;

    v.    Court cost and pre-judgment and post-judgment interest; and,

    vi.    Such other and further relief as to which Plaintiff may show himself justly entitled.

Respectfully submitted,

_____/s/ Russell D. Cawyer_____
Russell D. Cawyer
State Bar No. 00793482
Khari M. Ferrell
State Bar No. 24116357
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone:  817-878-3562
Facsimile:  817-335-2820
russell.cawyer@kellyhart.com
khari.ferrell@kellyhart.com

**ATTORNEYS FOR PLAINTIFF
JAMES HANCOCK, MD**

4254703