**Executive Employment Agreement**

THIS EXECUTIVE EMPLOYMENT AGREEMENT (the "Agreement") is made effective as of the 1st day of September 2024 (the "Effective Date"), by and between QSC Admin LLC d/b/a Quantify Specialty Care, a Delaware limited liability company with its principal office located in Dublin, OH ("Company"), and Dr. James Hancock ("Executive") with his home address located at 13004 Graphite Court, Clifton, VA 20124 and driver's license number DL - VA B62753727 .

WHEREAS, the Company desires to employ Executive as its Chief Medical Officer and Executive desires to serve in such capacities on behalf of the Company, upon the terms and conditions hereinafter set forth;

WHEREAS, the Executive acknowledges having had ample opportunity to review this Agreement, seek independent legal counsel, and enters into this Agreement willingly and with full understanding of its terms and implications;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and intending to be legally bound, the parties agree as follows:

1. Employment

    1.1 Employment Period.

    Subject to the provisions for earlier termination provided herein, Executive's employment hereunder shall be for a one (1) year term commencing on the Effective Date and ending on September 1, 2025 (the "***Initial Employment Period***"); provided, however, that this Agreement shall automatically renew for successive one (1) year periods thereafter (each a "***Renewal Period***" and together with the Initial Employment Period, the "***Employment Period***"), unless at least ninety (90) days prior to the end of the Initial Employment Period or any Renewal Period one party notifies the other in writing that he/it is exercising the option not to renew the term of this Agreement. The non-renewal of this Agreement as a result of a termination by the Company in the absence of a mutually acceptable successor employment agreement shall be deemed a termination of Executive's employment without Cause (pursuant to Section 3.1(a) or Section 3.2(a) below, as applicable), effective as of the last day of the then-current Employment Period.

    (a) Commencement Flexibility

    Both the Company and Executive recognize the value of flexibility in determining the precise start date of Executive's employment to accommodate unforeseen circumstances or mutual convenience. As such, while this Agreement is set to commence on the 1st day of September 2024, the Company and Executive agree that there is flexibility to initiate the employment relationship at an earlier or later date within August 2024, subject to mutual agreement. Any adjustment to the Effective Date will be communicated and confirmed in writing by both parties, without affecting the overall term of the Agreement or the rights and obligations herein.

    1.2 Duties and Responsibilities

    Executive shall serve as the Chief Medical Officer ("***CMO***") of the Company during the Employment Period, reporting to the President and/or Chief Executive Officer and/or



Hancock v. QSC
**Exhibit**
**A**





Chairman, and shall perform all duties and accept all responsibilities incident to such position as may be reasonably assigned to Executive by the President and/or Chief Executive Officer and/or Chairman. During the Employment Period. Notwithstanding the foregoing, following termination of Executive's employment for any reason other than for Cause, provided Executive has timely executed and not revoked the Release (as defined below).

1.3 Extent of Services

Executive shall use Executive's best efforts to carry out Executive's duties and responsibilities under Section 1.2 hereof and, consistent with the other provisions of this Agreement. In the performance of Executive's duties, Executive shall observe and adhere to all Company policies and procedures applicable generally to employees of the Company or to the Company's senior level executives, as may be adopted, revised, or deleted from time-to-time in the Company's sole discretion. Except with the prior consent of the Board, Executive shall not, during the Employment Period, undertake or engage in any other employment, occupation or business enterprise that would interfere in any material way with Executive's responsibilities and the performance of Executive's duties hereunder, provided that, for the avoidance of doubt, Executive shall be permitted to: (a) continue contracting operations with The Trident Group, LLC with its principal office located at 13004 Graphite Ct, Clifton VA 20124 for providing advice and direction to enhance the security and health of fighting forces and veterans; (b) Continue to be Advisor for the PARADIGM GROUP LLC with its principal office located at 210 W Wall St Grapevine, TX 76051in a not to interfere with duties capacity and devote reasonable time to volunteer services for or on behalf of such religious, educational, non-profit and/or other charitable organization as Executive may wish to serve; and (c) devote reasonable time to activities in the non-profit and business communities consistent with Executive's duties ("**Permitted Outside Activities**"). In addition, and for the further avoidance of doubt, the foregoing shall not be construed as preventing Executive from owning less than five percent (5%) of the total outstanding shares of a publicly traded company.

1.4 Principal Location of Services.

Executive shall perform Executive's duties hereunder principally out of office/ location of his choosing and shall undertake such travel within or outside of the United States as is necessary or advisable for the efficient operations of the Company.

2. Compensation and Benefits

2.1 Base Salary

The Company shall pay Executive a base salary at the annual rate of Seven Hundred Thousand Dollars ($700,000), payable in accordance with the normal payroll practices of the Company for its senior level executives as in effect from time to time (but no less frequently than monthly), which base salary shall be subject to annual review and may be increased but not decreased by the Board. Such base salary, as from time to time may be increased, is hereafter referred to as the "**Base Salary.**"

2.2 Annual Discretionary Cash Bonus

For each fiscal year during the Employment Period, commencing with the September 1, 2024 – September 1, 2025 fiscal year, Executive shall be eligible to receive an annual discretionary cash bonus (the "**Annual Bonus**"). The amount of the Annual Bonus, if any, will be determined by the Board in its discretion, based on Executive's individual performance and Company performance. Performance will be determined based on key performance indicators ("KPIs") to be proposed by Executive and subject to agreement by the Board. Executive's Annual Bonus target is 200% but not less than 50% of Executive's Base Salary rate for the applicable fiscal year (the "**Target Bonus**") and shall be paid if the agreed KPIs are achieved. The amount of the Annual Bonus will be determined as of the end of each fiscal year during the Employment Period and shall be paid in accordance with the Company's normal bonus schedule after the end of each fiscal year to which the bonus relates.

2.3 Equity Compensation

(a) Equity Grant

The Board shall grant to Executive 2% of the equity in Quantify Specialty Care. The first 1% of said equity shall vest upon the completion of 90 days of continuous employment with the Company. The remaining 1% shall vest in equal installments monthly over the subsequent two years, subject to the Executive's continuous employment with the Company during this period. Quantify Specialty Care reserves the right to buy back equity at the present fair-market value in the event of the termination of the Executive's employment. The Company may, at its sole and final discretion, choose to accelerate the vesting schedule.

(b) Vesting Following Termination

In the event of a termination of Executive's employment pursuant to any of Section 3.1 or Section 3.2, and provided Executive has timely executed and not revoked the Release (as defined below), Executive's outstanding equity shall continue to vest subject to Executive entering into an Advisory Agreement with Company and such Agreement remaining in effect. The term of such Advisory Agreement shall continue until the full vesting of the Stock Grant unless such Advisory Agreement is terminated for Cause. "Advisory Agreement" shall mean an agreement between Executive and the Company following the termination of Executive's employment that shall provide for Executive to offer advice to the Company's Board and management as reasonably requested and for Executive to continue to comply with the restrictions set forth in Sections 5, 6, 7 and 8 of this Agreement for the term of such Advisory Agreement.

2.4 Equity, Revenue Share, Net Operating Profit Share and Royalties within Special Purpose Vehicles (SPVs) and Special Commercial Activities

(a) Equity Grant in SPVs

In addition to the equity compensation provided under Section 2.3, the Company may, at its discretion, offer the Executive the opportunity to participate in Special Purpose Vehicles (SPVs) established by the Company or its affiliates. These opportunities will be designed to allow the Executive to hold an outsized equity participation in specific projects or ventures that are strategic to the Company's growth and innovation efforts.

The terms and conditions of such participation, including the extent of equity offered and any vesting conditions, will be determined on a case-by-case basis and formalized in separate agreements relevant to each SPV.

(b) Special Commercial Participation

The Company may, from time to time, engage in special commercial activities or ventures that present unique revenue or profit-sharing opportunities. In recognition of the Executive's contributions to the ideation, development, or execution of these activities:

(a) **Revenue Share:** The Executive may be entitled to a percentage of revenue derived from specific projects or commercial activities, as mutually agreed upon by the Executive and the Company. Such entitlement will be based on the Executive's direct contribution to the generation of revenue and will be outlined in detail in the respective project or activity agreement.

(b) **Net Operating Profit Share:** Alternatively, or in addition, the Executive may be entitled to a share of the net operating profit resulting from specific projects or commercial activities. The percentage of net operating profit share will be determined based on the strategic importance of the project and the Executive's role in its success, subject to a separate agreement that specifies the calculation methodology and payment terms.

(c) **Royalties:** Where applicable, the Executive may also be entitled to royalties from products, services, or intellectual property developed during their tenure, reflecting the Executive's innovative contributions to the Company. The terms, including the rate and duration of royalty payments, will be detailed in a separate royalty agreement.

All such participations and entitlements are intended to recognize and reward the Executive's exceptional contributions to the Company's strategic and commercial successes. Specific terms, conditions, and criteria for participation in these opportunities will be documented in separate agreements, which shall be supplementary to and consistent with the terms of this Executive Employment Agreement.

2.5 Vacation and Accessibility

While recognizing the importance of rest and personal time, Executive agrees to remain accessible during vacation periods for urgent or high-priority requests that require Executive's unique knowledge, expertise, or decision-making. The Company respects the Executive's right to uninterrupted time off and commits to exercising this provision with discretion and only under circumstances where Executive's specific input is deemed critically necessary for the resolution of time-sensitive issues. The Company shall endeavor to limit such requests to reasonable hours, considering Executive's time zone and previously communicated vacation schedule. This accessibility expectation is intended to balance the Company's operational needs with Executive's well-being and time off.

2.6 Reimbursement of Expenses

> Executive shall be reimbursed for all customary and appropriate business-related expenses actually incurred and documented in accordance with the Company's policies applicable to senior level executives. For purposes of this Agreement now and in the future, Company will provide first class airline travel for Executive and his service dog for all Company-related business travel.

2.7 Indemnification; D&O Insurance

> The Company shall indemnify Executive to the maximum extent permitted by law and its articles of incorporation and by-laws. The Company shall at all times maintain directors' and officers' liability insurance under which Executive shall be covered on a basis that is no less favorable in any respect than the coverage provided to any then-current director or officer of the Company.

3. Termination

Notwithstanding Section 1, Executive's employment shall terminate, and the Employment Period shall terminate concurrently therewith, upon the occurrence of any of the following events:

3.1 Termination Without Cause, Resignation for Good Reason, or Company Non-Renewal of the Employment Period.

(a) The Company may terminate Executive at any time without Cause (as defined in Section 3.7) prior to the expiration of the then-current Employment Period from the position in which Executive is employed hereunder upon not less than thirty (30) days' prior written notice to Executive, and the Company may terminate Executive upon the last day of the then-current Employment Period by providing the requisite notice not to renew in accordance with Section 1.1 above. The Company shall have the discretion to place Executive on "garden leave," and to not require or permit Executive to report to work or to provide any continued services, during the notice period, and the last day of any such notice period shall be the effective date of termination of Executive's employment as an active employee. In addition, Executive may initiate a termination of employment by resigning under this Section 3.1 for Good Reason (as defined in, and in accordance with the notice provisions set forth in, Section 3.7) prior to the expiration of the then-current Employment Period.

(b) Upon termination under this Section 3.1, Executive shall receive (i) Executive's accrued but unpaid Base Salary through the date of termination, (ii) any unreimbursed business expenses incurred by Executive and payable in accordance with the Company's standard expense reimbursement policies, (iii) benefits earned, accrued and due under any retirement plan, health and welfare benefit plan in which Executive was a participant in accordance with applicable law and the provisions of such plan, and (iv) any then-accrued-but-unused vacation (collectively, the "**Guaranteed Payments**"). With the exception of unreimbursed business expenses, which shall be paid in accordance with Company policy and Section 20 of this Agreement, Executive will be paid the Guaranteed Payments on the Company's first (1st) payroll date after Executive's date of termination, or earlier if required by applicable law.

(c) If Executive's employment terminates as described in Section 3.1(a) above prior to or in connection with the expiration of the then-current Employment Period and if Executive executes within twenty-one (21) days (or forty-five (45) days to the extent required by applicable law) thereafter and does not revoke a written release of claims in a form mutually acceptable to Executive and the Company releasing the Company from any and all claims with respect to all matters arising out of or related to Executive's employment by the Company or the termination thereof (the "**Release**"), Executive shall receive cash severance (the "**Severance**") in an amount equal to: 1) half (1/2) the Executive's Base Salary if terminated prior to the six (6) month anniversary of this Agreement; or 2) the Executive's Base Salary if terminated on or following the six (6) month anniversary of this Agreement (in each case determined without regard to any reduction in Base Salary giving rise to Good Reason). The Severance, less all required withholdings and deductions, shall be paid during the six (6) month period (in the case of a termination if terminated prior to the six (6) month anniversary of this Agreement) or the one (1) year period (in the case of a termination if terminated on or following six (6) month anniversary of this Agreement) commencing on Executive's date of termination in substantially equal installments consistent with the Company's regularly scheduled payroll until the Severance has been paid in full (the "**Severance Period**"), subject to Section 3.1(d) below.

(d) Except as otherwise required by Section 20 the benefits described in subsections (a) and (c) above shall begin within sixty (60) days after Executive's termination date, provided Executive has timely executed and not revoked the Release within such sixty (60) day period, and provided that, notwithstanding any provision of this Agreement to the contrary, in no event shall the timing of Executive's execution of the Release, directly or indirectly, result in Executive's designating the calendar year of payment, and if a payment that is "nonqualified deferred compensation" as defined under Section 409A ("**Section 409A**") of the Internal Revenue Code of 1986, as amended from time to time (the "**Code**") is subject to execution of the Release could be made in more than one taxable year, payment shall be made in the later taxable year.

(e) Executive agrees and acknowledges that the Severance provided to Executive pursuant to Section 3.1(c) is in lieu of, and is not in addition to, any benefits to which Executive may otherwise be entitled under any Company severance plan, policy, or program, other than the Guaranteed Payments.

3.2 Termination by Reason of Disability.

Subject to applicable state and federal law, the Company may terminate Executive's employment if Executive has been unable to perform the duties of Executive's position for a period of thirty (30) consecutive days, or ninety days (90) days in the aggregate during any twelve (12) month period, in either case because of physical or mental injury or illness ("**Disability**"). If the Company terminates Executive's employment for Disability, Executive will be entitled to all of the Severance payments and benefits set forth in Section 3.1(c), provided he (or, in the event of Executive's physical or mental incapacity, Executive's legal representative) executes within twenty-one (21) days (or forty-five (45) days to the extent required by applicable law) thereafter and does not revoke a Release (as defined in Section 3.1(c) above).

3.3 Termination by Reason of Death

If Executive dies while employed by the Company, all obligations of the Parties hereunder shall terminate immediately. Executive will not receive the Severance, or any other severance compensation or benefits, except that the Company shall pay to Executive's executor, legal representative, administrator or designated beneficiary, as applicable, (i) the Guaranteed Payments and (ii) any earned-but-unpaid Annual Bonus for the most-recently completed fiscal year of the Company, which shall be paid as soon as reasonably practicable after the end of the fiscal year to which it relates, but in no event later than 2-½ months after the end of the fiscal year.

3.4 Termination for Cause

The Company may terminate Executive's employment at any time for Cause upon written notice to Executive, and Executive may terminate Executive's employment at any time without Good Reason or may elect not to renew the then-current Employment Period by providing the requisite notice not to renew in accordance with Section 1.1 above, and in any such event all payments under this Agreement shall cease. Executive will not receive the Severance or any other severance compensation or benefits, except that the Company shall pay to Executive the Guaranteed Payments.

3.5 Notice of Termination

Any termination of Executive's employment shall be communicated by a written notice of termination to the other party hereto given in accordance with Section 13. The notice of termination shall (a) indicate the specific termination provision in this Agreement relied upon, (b) briefly summarize the facts and circumstances deemed to provide a basis for a termination of employment and the applicable provision hereof; provided, that no basis need be provided by the Company in connection with a termination without Cause or a Company non-renewal of the Employment Period, and (c) specify the termination date in accordance with the requirements of this Agreement.

3.6 Cooperation with the Company After Termination

Following termination of Executive's employment for any reason, Executive agrees to reasonably cooperate with the Company, subject to Executive's then current professional obligations in: (a) all matters relating to the winding up of Executive's pending work and the orderly transfer of any such pending work to such other employees as may be designated by the Company; (b) responding to requests by the Company for information concerning work performed by Executive during the period of Executive's employment with the Company and with regard to any matters that relate to or arise out of the business of the Company during the period of Executive's employment and about which Executive may have knowledge; and (c) any investigation or review that may be performed by the Company or any government authority or in any litigation in which the Company may become involved, as may be reasonably requested and after taking into account Executive's post-termination responsibilities and obligations.

3.7 Definitions

(a) "*Cause*" shall mean any of the following grounds for termination of Executive's employment:




(i) Executive's conviction or plea of "guilty" or "no contest" to any crime constituting a felony in the jurisdiction in which committed, any crime involving moral turpitude (whether or not a felony), or any other violation of criminal law involving dishonesty or willful misconduct that materially injures the Company (whether or not a felony);

(ii) Executive's willful misconduct in the performance of Executive's duties to the Company, where such willful misconduct has resulted in material harm to the business, property, or public reputation of the Company;

(iii) Executive's willful commission of any act of fraud or embezzlement with respect to the Company;

(iv) Executive's willful and material breach of any material provision of this Agreement.

For purposes of this Agreement, the Company shall have Cause to terminate Executive's employment upon the Board's reasonable determination in good faith that a "Cause" condition under such clauses has occurred.

(b) "**Good Reason**" shall mean the occurrence of any of the following events or conditions, unless Executive has expressly consented in writing thereto:

(i) A reduction in Executive's Base Salary or Target Bonus; or

(ii) A material breach by the Company of this Agreement.

For purposes of this Agreement, Executive shall not have Good Reason for termination unless: (i) Executive reasonably determines in good faith that a "Good Reason" condition has occurred; (ii) Executive notifies the Company in writing of the occurrence of the Good Reason condition within sixty (60) days of Executive's first becoming aware of such occurrence; (iii) Executive cooperates in good faith with the Company's efforts, for a period not less than thirty (30) days following such notice (the "**Good Reason Cure Period**"), to cure the condition, to the extent curable; (iv) notwithstanding such efforts, the Good Reason condition continues to exist; and (v) Executive terminates Executive's employment within sixty (60) days after the end of the Good Reason Cure Period. If the Company cures the Good Reason condition during the Good Reason Cure Period, Good Reason shall be deemed not to have occurred.

3.8 Required Postponement for Specified Executives.

If Executive is considered a "specified employee" (as defined under Section 409A) and payment of any amounts under this Agreement is required to be delayed for a period of six (6) months after separation from service pursuant to Section 409A, payment of such amounts shall be delayed as required by Section 409A, and the accumulated postponed amounts, shall be paid in a lump-sum payment within five (5) days after the end of the six (6) month period. If Executive dies during the postponement period prior to the payment of benefits, the amounts postponed on account of Section 409A, shall be paid to the personal representative of Executive's estate within sixty (60) days after the date of Executive's death.

3.9 No Mitigation; No Offset.

In the event of any termination of Executive's employment hereunder for any reason, Executive shall be under no obligation to seek other employment or to otherwise mitigate

DocuSign Envelope ID: D831E5ED-4A00-4B42-96CA-D0565668D488

the obligations of the Company under this Agreement. There shall be no offset against amounts due to Executive under this Agreement on account of any remuneration or other benefit earned or received by Executive after such termination or on account of any claim that the Company or any of its affiliates may have against him.

4. Non-Exclusivity of Rights

    Nothing in this Agreement shall prevent or limit Executive's continuing or future participation in or rights under any benefit, bonus, incentive or other plan or program provided by the Company and for which Executive may qualify; provided, however, that if Executive becomes entitled to and receives the Severance provided for in Section 3 of this Agreement, Executive hereby waives Executive's right to receive payments under any severance plan or similar program that would otherwise apply to Executive.

5. Confidentiality

    Executive agrees that Executive's services to the Company are of a special, unique, and extraordinary character, and that Executive's position places Executive in a position of confidence and trust with the Company's customers and employees. Executive also recognizes that Executive's position with the Company will give Executive substantial access to Confidential Information (as defined below), the disclosure of which to competitors of the

    Company would cause the Company to suffer substantial and irreparable damage. Executive recognizes, therefore, that it is in the Company's legitimate business interest to restrict Executive's use of Confidential Information for any purposes other than the discharge of Executive's employment duties at the Company or as otherwise set forth herein, and to limit any potential appropriation of Confidential Information by Executive for the benefit of the Company's competitors and/or to the detriment of the Company.

    Accordingly, Executive agrees as follows:

    (a) Executive will not at any time, whether during or after the termination of Executive's employment for any reason, reveal to any person or entity any of the trade secrets or confidential information of the Company or of any third party which the Company is under an obligation to keep confidential (including but not limited to trade secrets or confidential information respecting inventions, products, designs, methods, know-how, techniques, systems, processes, software programs, works of authorship, projects, plans and proposals) ("**Confidential Information**"), except as may be required in the ordinary course of performing Executive's duties as an employee of the Company, and Executive shall keep secret all matters entrusted to Executive and shall not use or attempt to use any such information in any manner which may injure or cause loss or may be calculated to injure or cause loss whether directly or indirectly to the Company.

    (b) The above restrictions shall not apply to: (i) information that at the time of disclosure has become available to the public or is in the public domain through no fault of Executive; (ii) information received from a third party outside of the Company that was disclosed without a breach of any confidentiality obligation; (iii) information approved for release or disclosure by the Board or (iv) information that may be required by law or pursuant to legal process or an order

of any court, agency, or proceeding to be disclosed; provided that Executive shall provide the Company prior written notice of any such required disclosure once Executive has knowledge of it and will help the Company to the extent reasonable to obtain an appropriate protective order. Moreover, the foregoing shall not limit Executive's ability to: (i) discuss the terms of Executive's employment, wages and working conditions to the extent expressly protected by applicable law; (ii) report possible violations of federal securities laws to the appropriate government enforcing agency and make such other disclosures that are expressly protected under federal or state "whistleblower" laws; or (iii) respond to inquiries from, or otherwise cooperate with, any governmental or regulatory investigation.

(c) Executive agrees that during Executive's employment Executive shall not take, use or permit to be used any notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, data, documentation or other materials of any nature relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs otherwise than for the benefit of the Company. Executive further agrees that Executive shall not, after the termination of Executive's employment for any reason, use or permit to be used any such notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, data, documentation or other materials, it being agreed that all of the foregoing shall be and remain the sole and exclusive property of the Company and that, immediately upon the termination of Executive's employment for any reason, Executive shall deliver all of the foregoing, and all copies thereof, to the Company, at its main office. For the avoidance of doubt, following a termination of Executive's employment, Executive shall be entitled to retain: (i) papers and other materials of a personal nature, including, but not limited to, photographs, personal correspondence, personal diaries, personal calendars, and electronic contacts and/or rolodexes; (ii) information relating to Executive's equity, compensation, or expense reimbursements; (iii) information that Executive reasonably believes may be needed for his personal tax purposes; and (iv) copies of employee benefit and compensation plans and policies of the Company in which Executive participated as of the date of his termination of employment.

(d) Executive agrees that upon the termination of Executive's employment with the Company for any reason, Executive will not take or retain without authorization any documents, files or other property of the Company, and Executive will return promptly to the Company any such documents, files or property in Executive's possession or custody, including any copies thereof maintained in any medium or format. Executive recognizes that all documents, files and property that Executive has received and will receive from the Company, including but not limited to scientific research, customer lists, handbooks, memoranda, product specifications, and other materials (with the exception of documents relating to benefits to which Executive might be entitled following the termination of Executive's employment with the Company), are for the exclusive use of the Company and employees who are discharging their responsibilities on behalf of the Company, and that Executive has no claim or right to the continued use, possession, or custody of such documents, files or property following the termination of Executive's employment with the Company for any reason.

(e) Pursuant to the Defend Trade Secrets Act of 2016, Executive acknowledges that Executive will not have criminal or civil liability under any federal or state trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding if such filing is made under seal. In addition, if Executive files a lawsuit for alleged retaliation by the Company for reporting a suspected violation of law, Executive may disclose the trade secret to Executive's attorney and may use the trade secret information in the court proceeding if Executive: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

6. Intellectual Property

(a) If, in the performance of Executive's duties to the Company, Executive shall (either alone or with others) make, conceive, discover or reduce to practice any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, technique, know-how, secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) (herein called "**Developments**") that: (i) relates to the business of the Company or any customer of or supplier to the Company or any of the products or services being developed, manufactured or sold by the Company or which may be used in relation therewith; (ii) results from tasks assigned to Executive by the Company; and (iii) results from the use of business premises or property (whether tangible or intangible) owned, leased or contracted for by the Company, such Developments and the benefits thereof shall immediately become the sole and absolute property of the Company and its assigns, and Executive shall promptly disclose to the Company (or any persons designated by it) each such Development, and Executive hereby assigns any rights Executive may have or acquire in the Developments and benefits and/or rights resulting therefrom to the Company and its assigns without further compensation and shall communicate, without cost or delay, and without publishing the same, all available information relating thereto (with all necessary plans and models) to the Company.

(b) Upon disclosure of each Development to the Company, Executive will, during Executive's employment and at any time thereafter, at the request and cost of the Company, sign, execute, make and do all such deeds, documents, acts and things as the Company and its duly authorized agents may reasonably require:
(i) to apply for, obtain and vest in the name of the Company alone (unless the Company otherwise directs) letters patent, copyrights or other analogous protection in any country throughout the world and when so obtained or vested to renew and restore the same; and
(ii) to defend any opposition proceedings in respect of such applications and any opposition proceedings or petitions or applications for revocation of such letters patent, copyright or other analogous protection.

7. Non-Competition

During the Employment Period and for a period of twenty-four (24) months after termination of Executive's employment (for any reason whatsoever, whether voluntary or involuntary) (the "**Non-Competition Period**"), Executive will not, without prior disclosure to the Board, whether alone or as a partner, officer, director, consultant, agent,

employee or stockholder of any company or other commercial enterprise, engage in any business or other activity anywhere in the world that competes with the Company in specific enterprises in direct competition with current company entities therefor (the "**Business**"). The foregoing prohibition shall not prevent: (i) Executive's employment or engagement after termination of Executive's employment by any company or business organization, as long as the activities of any such employment or engagement, in any capacity, do not involve work on matters related to the products being developed, manufactured, or marketed by the Company during Executive's employment with the Company; or (ii) Executive from engaging in Permitted Outside Activities. For the avoidance of doubt, the foregoing shall not be construed as preventing Executive from owning securities of a public company not in excess of five percent (5%) of any class of such securities or from owning stock, partnership interests or other securities of any entity not in excess of five percent (5%) of any class of such securities and such ownership shall not be considered to be in competition with the Company.

For the purposes of this Agreement, a competing business is defined as any entity or individual that provides products, services, solutions, or activities that are the same as or substantially similar to those provided by Quantify Specialty Care, specifically including but not limited to services directed towards companies that self-fund their health insurance (also known as self-insuring employers) and/or its service providers.

This restriction applies to any such competing businesses or activities within any geographic area where Quantify Specialty Care operates or has concrete plans to operate during the term of Executive's employment. The Executive acknowledges that this restriction is reasonable and necessary to protect the Company's legitimate business interests, including its proprietary information, customer relationships, and investment in the services unique to self-insuring employers and their service providers.

8. Non-Solicitation

   During the Employment Period and for a period of twenty-four (24) months after termination of such employment (for any reason, whether voluntary or involuntary), Executive agrees that Executive will not:
   (a) directly or indirectly solicit, entice or induce, or attempt to solicit, entice or induce, any customer, vendor, supplier, or business development partner to cease doing business with or diminish its business relationship with the Company, and Executive shall not approach any such person, firm or corporation for such purpose or authorize or knowingly approve the taking of such actions by any other person; or
   (b) directly or indirectly solicit or recruit, or attempt to solicit or recruit, any employee, consultant or independent contractor of the Company to terminate employment or to otherwise cease providing services to the Company or (other than in respect of consultants or independent contractors whose services are available generally to, and who provide significant services to, multiple unrelated service providers other than the Company) to work for a third party other than the Company; and Executive shall not approach any such person for such purpose or authorize or knowingly approve the taking of such actions by any other person; provided, that the placement of general advertisements in newspapers, magazines, or electronic media or other solicitation not specifically targeted shall not, by itself, constitute a breach of this subsection

9. General Provisions

    (a) Executive acknowledges and agrees that the type and periods of restrictions imposed in Sections 5, 6, 7 and 8 of this Agreement are fair and reasonable, and that such restrictions are intended solely to protect the legitimate interests of the Company, rather than to prevent Executive from earning a livelihood. Executive recognizes that the Company competes worldwide, and that Executive's access to Confidential Information makes it necessary for the Company to restrict Executive's post-employment activities in any market which directly competes with the company and in which Executive's access to Confidential Information could be used to the detriment of the Company. In the event that any restriction set forth in this Agreement is determined to be overbroad with respect to scope, time or geographical coverage, Executive agrees that such a restriction or restrictions should be modified and narrowed, either by a court or by the Company, so as to primarily preserve and protect the Executive's right to work while also protecting the legitimate interests of the Company as described in this Agreement to the extent possible without negating or impairing any other restrictions or agreements set forth herein.

    (b) Executive acknowledges and agrees that if Executive should breach any of the covenants, restrictions and agreements contained herein, irreparable loss and injury would result to the Company, and that damages arising out of such a breach may be difficult to ascertain. Executive therefore agrees that, in addition to all other remedies provided at law or at equity, the Company shall be entitled to seek to have the covenants, restrictions and agreements contained in Sections 5, 6, 7 and 8 specifically enforced (including, without limitation, by temporary, preliminary, and permanent injunctions and restraining orders) by any state or federal court in the State of Texas having equity jurisdiction, and Executive agrees to be subject to the jurisdiction of such court.

    (c) Executive agrees that if the Company fails to take action to seek a remedy of any breach by Executive of this Agreement or any portion of the Agreement, such inaction by the Company shall not operate or be construed as a waiver of any subsequent breach by Executive of the same or any other provision, agreement or covenant.

    (d) Executive acknowledges and agrees that the payments and benefits to be provided to Executive under this Agreement are provided as consideration for the covenants in Sections 5, 6, 7 and 8 hereof in addition to the services to be provided by and other obligations of Executive hereunder.

10. Non-disparagement.

    Upon Executive's termination of employment with the Company for any reason, neither party shall make any disparaging public comments, oral or written, concerning the other, or publicly take any other action that reasonably could be construed as disparaging the reputation of the other.

11. No Conflict with Existing Obligations

    Executive represents and warrants that Executive has disclosed to the Company any and all prior nondisclosure, confidentiality, noncompetition, non-solicitation or other similar obligations and/or restrictive covenants to or with any prior employer, entity, or other person (together, the "**Prior Restrictive Covenants**"), and that no Prior Restrictive Covenant

prohibits, restricts, limits or otherwise affects Executive's employment with the Company as an executive or ability to perform any of Executive's duties or responsibilities for the Company. Executive agrees that Executive will not enter into any agreement or obligation, either written or oral, in conflict herewith.

12. Survivorship

   The respective rights and obligations of the parties under this Agreement shall survive any termination of Executive's employment to the extent necessary to the intended preservation of such rights and obligations.

13. Notices

   All notices and other communications required or permitted under this Agreement or necessary or convenient in connection herewith shall be in writing and shall be deemed to have been given when hand delivered or mailed by registered or certified mail, as follows (provided that notice of change of address shall be deemed given only when received):

   If to the Company, to:

   Attn: Legal Counsel
   3 Columbus Circle, 15th Floor
   New York NY 10019

   If to the Executive:
   Dr. James Hancock
   13004 Graphite Ct,
   Clifton, VA 20124

   To the address of Executive's principal residence most recently on file with the Company or to such other names or addresses as the Company or Executive, as the case may be, shall designate by notice to each other person entitled to receive notices in the manner specified in this Section.

14. Contents of Agreement: Amendment and Assignment.

   (a) This Agreement sets forth the entire understanding between the parties hereto with respect to the subject matter hereof and supersedes any and all prior agreements and understandings concerning Executive's employment by the Company and cannot be changed or modified except upon written amendment approved by the Board and executed on its behalf by a duly authorized officer and by Executive.
   (b) All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, except that the duties and responsibilities of Executive under this Agreement are of a personal nature and shall not be assignable or delegable in whole or in part by Executive. The Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation, reorganization or otherwise) to all or substantially all of the business or assets of the Company, within fifteen (15) days of such succession, expressly to assume and agree to perform this Agreement in the same manner as, and to the same extent that, the Company would be required to perform if no such succession had taken place.

15. Severability

    If any provision of this Agreement or application thereof to anyone or under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement that can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction. If any provision is held void, invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances

16. Remedies Cumulative; No Waiver

    No remedy conferred upon a party by this Agreement is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under this Agreement or now or hereafter existing at law or in equity. No delay or omission by a party in exercising any right, remedy or power under this Agreement or existing at law or in equity shall be construed as a waiver thereof, and any such right, remedy or power may be exercised by such party from time to time and as often as may be deemed expedient or necessary by such party in its sole discretion.

17. Withholding

    All payments under this Agreement shall be made subject to applicable tax withholding, and the Company shall withhold from any payments under this Agreement all federal, state and local taxes as the Company is required to withhold pursuant to any law or governmental rule or regulation. Executive shall bear all expense of, and be solely responsible for, all federal, state and local taxes due with respect to any payment received under this Agreement, other than such taxes that are, by their nature, obligations of the Company (for example, and without limitation, the employer portion of the Federal Insurance Contributions Act (FICA) taxes, and any corporate taxes incurred by the Company as a result of the disallowance of any tax deduction for compensation paid to Executive).

18. Counterparts

    This Agreement may be executed in counterparts, each of which is an original. It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts. Facsimile signatures and signatures transmitted by PDF shall be equivalent to original signatures.

19. Section 409A

    This Agreement is intended to comply with or otherwise be exempt from Section 409A and its corresponding regulations, to the extent applicable, and shall be so construed. Notwithstanding anything in this Agreement to the contrary, payments of "nonqualified deferred compensation" subject to Section 409A may only be made under this Agreement upon an event and in a manner permitted by Section 409A, to the extent applicable. For purposes of Section 409A, all payments of "nonqualified deferred compensation" subject to Section 409A to be made upon the termination of Executive's employment under this

Agreement may only be made upon a "separation from service" under Section 409A. Each payment made under this Agreement shall be treated as a separate payment and the right to a series of installment payments under this Agreement is to be treated as a right to a series of separate payments. In no event shall Executive, directly or indirectly, designate the calendar year of payment with respect to any amount that is "nonqualified deferred compensation" subject to Section 409A. All reimbursements provided under this Agreement that are "nonqualified deferred compensation" that is subject to Section 409A shall be made or provided in accordance with Section 409A, including, where applicable, the requirements that (a) any reimbursement is for expenses incurred during the Employment Period (or during such other time period specified in this Agreement), (b) the amount of expenses eligible for reimbursement during a calendar year may not affect the expenses eligible for reimbursement in any other calendar year, (c) the reimbursement of an eligible expense will be made on or before the last day of the taxable year following the year in which the expense is incurred, and (d) the right to reimbursement is not subject to liquidation or exchange for another benefit. Nothing herein shall be construed as having modified the time and form of payment of any amounts or payments of "nonqualified deferred compensation" within the meaning Section 409A that were otherwise payable pursuant to the terms of any agreement between Company and Executive in effect prior to the date of this Agreement.

20. Section 280G of the Code

    Notwithstanding any other provision of this Agreement or any other plan, arrangement or agreement to the contrary, if any of the payments or benefits provided or to be provided by the Company or its affiliates to Executive or for Executive's benefit pursuant to the terms of this Agreement or otherwise (the "**Covered Payments**") constitute parachute payments (the "**Parachute Payments**") within the meaning of Section 280G of the Code and would, but for this Section 21 would be subject to the excise tax imposed under Section 4999 of the Code (or any successor provision thereto) or any similar tax imposed by state or local law or any interest or penalties with respect to such taxes (collectively, the "Excise Tax"), then prior to making the Covered Payments, a calculation shall be made comparing (i) the Net Benefit (as defined below) to the Executive of the Covered Payments after payment of the Excise Tax to (ii) the Net Benefit to the Executive if the Covered Payments are limited to the extent necessary to avoid being subject to the Excise Tax. Only if the amount calculated under (i) above is less than the amount under (ii) above will the Covered Payments be reduced to the minimum extent necessary to ensure that no portion of the Covered Payments is subject to the Excise Tax (that amount, the "**Reduced Amount**"). "Net Benefit" shall mean the present value of the Covered Payments net of all federal, state, local, foreign income, employment and excise taxes.

    (a) Any such reduction shall be made in accordance with Section 409A and the following:
       (i) the Covered Payments which do not constitute nonqualified deferred compensation subject to Section 409A shall be reduced first; and
       (ii) all other Covered Payments shall then be reduced as follows: (A) cash payments shall be reduced before non-cash payments; and (B) payments to be made on a later payment date shall be reduced before payments to be made on an earlier payment date.
    (c) Any determination required under this Section 21 shall be made in writing in good faith by the accounting firm that was the Company's independent auditor immediately before the change in control/an independent accounting firm selected by



      the Company/an independent accounting firm selected by the Company that is reasonably acceptable to the Executive (the "***Accountants***"). The Company and the Executive shall provide the Accountants with such information and documents as the Accountants may reasonably request in order to make a determination under this Section 21. For purposes of making the calculations and determinations required by this Section 21, the Accountants may rely on reasonable, good faith assumptions and approximations concerning the application of Section 280G and Section 4999 of the Code. The Accountants' determinations shall be final and binding on the Company and the Executive. The Company shall be responsible for all fees and expenses incurred by the Accountants in connection with the calculations required by this Section 21.

(d) It is possible that after the determinations and selections made pursuant to this Section 21 the Executive will receive Covered Payments that are in the aggregate more than the amount provided under this Section 21 ("***Overpayment***") or less than the amount provided under this Section 21 ("***Underpayment***").

    (i) In the event that: (A) the Accountants determine, based upon the assertion of a deficiency by the Internal Revenue Service against either the Company or the Executive which the Accountants believe has a high probability of success, that an Overpayment has been made or (B) it is established pursuant to a final determination of a court or an Internal Revenue Service proceeding that has been finally and conclusively resolved that an Overpayment has been made, then the Executive shall pay any such Overpayment to the Company together with interest at the applicable federal rate (as defined in Section 7872(f)(2)(A) of the Code) from the date of the Executive's receipt of the Overpayment until the date of repayment.

    (ii) In the event that: (A) the Accountants, based upon controlling precedent or substantial authority, determine that an Underpayment has occurred or (B) a court of competent jurisdiction determines that an Underpayment has occurred, any such Underpayment will be paid promptly by the Company to or for the benefit of the Executive together with interest at the applicable federal rate (as defined in Section 7872(f)(2)(A) of the Code) from the date the amount would have otherwise been paid to the Executive until the payment date.

                      Signature Page Follows

**IN WITNESS WHEREOF**, the parties hereto have executed this Executive Employment Agreement as of the date first above written.

**QSC Admin LLC, d/b/a Quantify Specialty Care**

Signature: _____

Name: Justin Goldston
Title: President, Quantify Specialty Care
Date: 3/28/2024

**QSC Admin LLC, d/b/a Quantify Specialty Care**

Signature: _____

Name: Sumanth Reddy
Title: Chairman, Quantify Specialty Care
Date: 3/28/2024

**EXECUTIVE**
Signature: _____
Name: Dr. James Hancock
Date: 3/28/2024